## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | |
|---|---|
| **PERNEVLYN C. COGGINS** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **Civil No. WGC-05-248** |
| | ) |
| **FREDERICK E. DAVIS,** | ) |
| **SHERIFF, CHARLES COUNTY** | ) |
| | ) |
| **Defendant.** | ) |
_____ )

## MEMORANDUM OPINION

Plaintiff, an African American female who applied for and ultimately was not selected

for the position of Systems Administrator with the Charles County Sheriff's Office, brought this

action against Frederick E. Davis, Sheriff of Charles County, Maryland, alleging two separate

counts of discrimination, based on race and on sex, in violation of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e *et seq.*  The parties consented to proceed before a United States

Magistrate Judge for all further proceedings and the entry of a final judgment.  *See* Docket Nos.

8-9.  Pending before the court and ready for resolution is Defendant's Motion for Summary

Judgment (Docket No. 18).  Plaintiff filed an Opposition (Docket No. 22) and Defendant a Reply

Memorandum (Docket No. 25).  With the court's permission, *see* Docket No. 29, Plaintiff filed a

Surreply (Docket No. 26).  No hearing is deemed necessary and the court now rules pursuant to

Local Rule 105.6 (D. Md. 2004).

### I.  BACKGROUND

Sometime during November 2002, the Charles County Sheriff's Office advertised for the

position of Systems Administrator with a closing date of November 27, 2002. Compl. ¶ 11,

Answer ¶ 11; *see* Docket No. 22, Ex. 10. Pernevlyn Coggins, an African American female,

learned about the vacancy announcement from Eric Halvorsen, a Caucasian male, the manager of

Management and Information Systems ("MIS") section at the Charles County Sheriff's Office

and a member of her church. Docket No. 18, Ex. 1 (Coggins Dep. 81:15 - 22); Ex. 2 (Halvorsen

Dep. 39:9 - 17). Ms. Coggins submitted an application for the Systems Administrator position

which the Charles County Sheriff's Office received on November 12, 2002. Compl. ¶ 12;

Answer ¶ 12; Docket No. 18, Ex. 24; Docket No. 22, Ex. 12. The Charles County Sheriff's

Office subsequently arranged an interview with Ms. Coggins.

On December 20, 2002, Ms. Coggins was interviewed by a three person panel from the

Charles County Sheriff's Office. The panelists were Mr. Halvorsen, Joseph Crehan, a Caucasian

male, the Personal Computer Operations Supervisor, and Tressa Keys[1], an African American

female, a Computer Aide Dispatcher Specialist Supervisor. The panel was impressed with Ms.

Coggins' background and skills. After conducting all the interviews, the panel ranked the

applicants. The panel, as a group, ranked Ms. Coggins the number one candidate for the

position. Compl. ¶ 15; Answer ¶ 15; Docket No. 18, Ex. 12.

Thereafter, Mr. Halvorsen took the panel's ranking sheet for the Systems Administrator

position to Betsy Leonhard, a Caucasian female, Manger of Human Resources at the Charles

County Sheriff's Office. In accordance with internal procedures, Human Resources would

contact the selectee and begin the background process. Unlike previous occasions when Mr.

---

[1] Subsequent to the filing of this lawsuit, on September 10, 2005, Tressa Keys married and is now known as Tressa Gray. *See* Docket No. 18, Ex. 4 (Gray Dep. 13:25 - 14:3, 27:7 - 10). Throughout this opinion the court will refer to this individual as Tressa Keys, as she was known during the time the alleged racial and sexual discrimination occurred.

Halvorsen submitted a selectee to Human Resources, on this occasion, Ms. Leonhard recommended that two candidates for the Systems Administrator position be sent to the Background Investigations Unit.  Docket No. 18, Ex. 2 (Halvorsen Dep. 61:4 - 18, 66:12 - 25); Docket No. 22, Ex. 6 (Halvorsen Dep. 61:4 - 18, 65:18 - 66:25).  Ms. Leonhard decided to send the top two candidates for background investigations.  Docket No. 22, Ex. 6 (Halvorsen Dep. 67:13 - 15), Ex. 7 (Leonard Dep. 34:19 - 21, 36:13 - 14).  Mr. Halvorsen understood Ms. Leonhard's recommendation was based on a previous experience when a selectee was sent for a background investigation, did not cooperate, and the Charles County Sheriff's Office had to re-advertise the position, re-interview and select another candidate, and this second candidate did not make it through the background investigation.  Docket No. 18, Ex. 2 (Halvorsen Dep. 61:20 - 63:6); Docket No. 22. Ex. 6 (Halvorsen Dep. 61:20 - 63:6).

Contrarily, Ms. Leonhard claims that Human Resources, on a regular basis, will recommend two candidates be sent to the Background Investigations Unit "to just save time in case one didn't work out and we had two people in background and didn't have to go through the whole process all over again."  Docket No. 22, Ex. 7 (Leonhard Dep. 36:14 - 17).  Before Ms. Leonhard's recommendation, Mr. Halvorsen had no intention of submitting two candidates for a background investigation.  *Id.*, Ex. 6 (Halvorsen Dep. 69:19 - 25).  Based on the panel's ranking sheet for the Systems Administrator position, Maxym Kuminov, a Caucasian male, was the panel's number two choice.  Mr. Halvorsen agreed with Ms. Leonhard's recommendation to send Ms. Coggins and Mr. Kuminov to the Background Investigations Unit.

That same day, December 20, 2002, Julie Shontere, a Caucasian female, Human Resources Coordinator at the Charles County Sheriff's Office, called Ms. Coggins and Mr.

Kuminov and informed each individually that she/he was one of two candidates competing for the position and informed each candidate that she/he needed to complete a Personal History Statement ("PHS").  *Id.*, Ex. 9 (Shontere Dep. 22:14 - 23:7).  According to Ms. Coggins, when Ms. Shontere called, Ms. Shontere remarked that she (Ms. Coggins) must have really impressed the panel.  Ms. Coggins asked if she was selected for the position.  Ms. Shontere responded no.  Ms. Shontere informed Ms. Coggins she was one of two candidates, whose qualifications were closely matched and that Ms. Coggins needed to have a background investigation.  Ms. Shontere instructed Ms. Coggins to come to the Charles County Sheriff's Office to pick up a packet.  *Id.*, Ex. 2 (Coggins Dep. 23:6 - 24:2).  That same day Ms. Coggins visited the Sheriff's Office and obtained the packet.

That evening Ms. Coggins saw Mr. Halvorsen at church.  Mr. Halvorsen told Ms. Coggins that she had impressed the panel and the only remaining requirement was a background investigation.  Ms. Coggins also spoke with Mr. Halvorsen's wife who disclosed that Ms. Coggins was everyone's number one choice.  Mrs. Halvorsen also mentioned that Ms. Coggins' only remaining requirement was a background investigation.  Ms. Coggins understood that, if she was unsuccessful with the background investigation, she would not be hired.  Docket No. 18, Ex. 1 (Coggins Dep. 84:2 - 12); Docket No. 22, Ex. 2 (Coggins Dep. 83:14 - 84:12).

Ms. Coggins completed the PHS, signed it and had it notarized on December 27, 2002.  Docket No. 18, Ex. 15 (C00143).  Ms. Coggins recollects that she submitted the completed PHS on that same date.  Docket No. 22, Ex. 2 (Coggins Dep. 91:8 - 23).  According to Ms. Shontere, Ms. Coggins hand-delivered the PHS on December 30, 2002, the same day Ms. Shontere wrote a memorandum summarizing her interactions with Ms. Coggins and sent Ms. Coggins' file to the

Background Investigations Unit.  *Id.*, Ex. 9 (Shontere Dep. 42:24 - 43:10).  Ms. Coggins claims

her 12 year old daughter accompanied her whereas Ms. Shontere does not recall anyone with

Ms. Coggins.  *Compare id.*, Ex. 2 (Coggins Dep. 91:23 - 24) *with* Docket No. 18, Ex. 5

(Shontere Dep. 58:11 - 16); Docket No. 22, Ex. 9 (Shontere Dep. 58:11 - 16).

Both Ms. Coggins and Ms. Shontere agree, when Ms. Coggins arrived to submit her PHS,

she requested a copy for her records.  Ms. Shontere replied that she could not photocopy the

entire document but agreed to copy select pages.  Ms. Coggins identified the specific pages

which Ms. Shontere copied.  Docket No. 18, Ex. 1 (Coggins Dep. 94:18 - 24), Ex. 5 (Shontere

Dep. 52:12 - 17); Docket No. 22, Ex. 2 (Coggins Dep. 94:18 - 24), Ex. 9 (Shontere Dep. 52:12 -

17).  Either while Ms. Shontere was copying selected pages of the PHS or after Ms. Shontere

copied those pages, Ms. Coggins inquired about the salary for the position.  Ms. Shontere

responded, they did not tell you in the interview?  Ms. Coggins replied no.  Ms. Shontere then

stated she would need to go to her desk to look up the information.  Ms. Coggins (and her

daughter) accompanied Ms. Shontere back to her desk.  Docket No. 18, Ex. 1 (Coggins Dep.

96:20 - 25), Ex. 5 (Shontere Dep. 54:20 - 55:1, 55:14 - 17); Docket No. 22, Ex. 2 (Coggins Dep.

96:20 - 97:2).

When Ms. Shontere disclosed the salary for the Systems Administrator position, Ms.

Coggins asked if the salary is negotiable.  Ms. Shontere responded no, the amount stated is the

starting salary.  Ms. Coggins does not recall what she said in response, but denies asking a

second time if the salary is negotiable.  Docket No. 18, Ex. 1 (Coggins Dep. 98:6 - 99:1); Docket

No. 22, Ex. 2 (Coggins Dep. 98:6 - 99:1).  According to Ms. Shontere, when she disclosed the

salary, Ms. Coggins "kind of just, humped at it, that, that, that the salary wasn't enough."

Docket No. 18, Ex. 5 (Shontere Dep. 55:10 -11).

> Q:  What were the exact words that Pernevlyn Coggins used when you told her what the salary was, and her responses?
>
> A:  I don't remember exact words, I do remember her response was kind of like a, a hump, I'm not sure what, how you're going to transcribe that, but her body language and her expression, and she said it wasn't enough for the experience?
>
> Q:  She said it wasn't enough?
>
> A:  Yeah, she, she said she, she said, to my recollection, she said she didn't feel it was enough for her experience.

*Id.*, Ex. 5 (Shontere Dep. 70:8 - 18); Docket No. 22, Ex. 9 (Shontere Dep. 70:8 - 18).

According to Ms. Shontere, Ms. Coggins then complained about the amount of paperwork she was required to complete even though she did not have the position. Ms. Shontere recalled Ms. Coggins proclaiming that she did not have to fill out as much paperwork in order to obtain her Secret clearance. Ms. Coggins mentioned several times that the Charles County Sheriff's Office ("Sheriff's Office") was requiring a lot without promising a job. Docket No.18, Ex. 5 (Shontere Dep. 55:21 - 56:3). Ms. Shontere explained the process to Ms. Coggins who seemed agitated and aggravated. Ms. Coggins denies complaining about excessive paperwork or remarking that she did not have to submit the volume of information required by the Sheriff's Office for her top secret clearance. Docket No. 22, Ex. 2 (Coggins Dep. 102:19 - 103:2).

According to Ms. Shontere, when she reviewed Ms. Coggins' PHS, she noticed Ms. Coggins did not have any educational information, *i.e.*, high school diploma and college transcripts. When Ms. Shontere reminded Ms. Coggins about these documents, Ms. Coggins questioned her, asking why does she need to submit a high school diploma if she has a college

degree.  Ms. Shontere responded that she does not make the policy, she just gathers the

paperwork.  Docket No. 18, Ex. 5 (Shontere Dep. 52:5 - 12); Docket No. 22, Ex. 9 (Shontere

Dep. 52:5 - 12).

Ms. Shontere viewed Ms. Coggins' attitude as challenging.  Ms. Shontere found Ms.

Coggins' aggressive mannerism shocking as Ms. Coggins questioned the Sheriff's Office

process.  At one point Ms. Shontere asked Ms. Coggins if she wanted to continue the process

knowing that she may not be selected for the position.  Ms. Coggins responded yes.  Ms.

Shontere accepted Ms. Coggins' paperwork, their conversation ended and Ms. Shontere escorted

Ms. Coggins out of the building.  Docket No. 18, Ex. 5 (Shontere Dep. 55:25 - 56:18).

Ms. Coggins' recollection differs from Ms. Shontere.

> A:  [Ms. Shontere] said – – I asked her how long would – – does the
> background investigation take, or, you know, the Sheriff's Office
> would do, how long does it normally take and she said it takes about
> six weeks.  And then I asked her – – I said, oh.  She said, it takes
> about six weeks.  I said, oh.  And I said I was hoping to, you know,
> to be able to start work before then.  I was hoping I'd be able to know
> something before then and she said, well, are you still interested and
> she handed me back my packet and, you know, she started, you
> know, handing me back my packet and I said, oh, I said, yes, I'm still
> interested, yeah.  Yeah, I would like the job, yes.

Docket No. 18, Ex. 1 (Coggins Dep. 99:14 - 25); Docket No. 22, Ex. 2 (Coggins Dep. 99:14 -

25).

Ms. Shontere provided Ms. Coggins some suggestions for speeding up the process.  Ms.

Coggins thanked Ms. Shontere and left the building.

After Ms. Coggins' departure, Ms. Shontere spoke with her manager, Ms. Leonhard,

about her (Shontere's) encounter with Ms. Coggins.  Ms. Leonhard did not speak with Ms.

Coggins on the day Ms. Coggins submitted her PHS.  Ms. Leonhard did not hear the

conversation between Ms. Shontere and Ms. Coggins.  According to Ms. Leonhard, Ms.

Shontere was very upset at Ms. Coggins' demeanor.

> A:   [Ms. Shontere] was, I guess, appalled, is a good way to put it.
> Usually applicants who may come in are very – – they want to please.
> They want to give us all the correct documents.  They want the job.
> They act like they want the job. [Ms. Coggins] was very
> argumentative; argued about the salary. She argued about the amount
> of documents she had to provide. [Ms. Shontere] did tell me she
> explained to her that we require those documents of all applicants;
> that we were sending – – she reiterated that we were, in fact, sending
> two applicants to background and she was just very argumentative to
> the point where it upset [Ms. Shontere], and [Ms. Shontere's] been
> through a lot so it takes a lot to upset her, but she was just, I guess,
> appalled and shocked that an applicant who wanted this job so badly
> was just not very cooperative

Docket No. 18, Ex. 6 (Leonhard Dep. 43:12 - 25); Docket No. 22, Ex. 7 (Leonhard Dep. 43:12 -

25).

Ms. Leonhard recommended Ms. Shontere write a memorandum to the file documenting

the unusual behavior of Ms. Coggins.  Docket No. 18, Ex. 6 (Leonhard Dep. 44:20 -24); Docket

No. 22, Ex. 7 (Leonhard Dep. 44:20 - 24).  Ms. Shontere complied with Ms. Leonhard's

recommendation.  In the December 30, 2002[2] Memorandum to File, Ms. Shontere wrote the

---

[2] Ms. Shontere claims that she prepared this memorandum (Memo-File Coggins) on December 30, 2002.
As displayed on Exhibit 17 (Computer Screen Shot) of Docket No. 22, Ms. Shontere created a "Memos" folder on
February 4, 2005 to organize all the memos she had prepared.  This exhibit also shows that the "Memo-File
Coggins" was modified on May 1, 2003, the day after the Charles County Sheriff's Office received the *Notice of
Charge of Discrimination* from the United States Equal Employment Opportunity Commission.  *See* Docket No. 22,
Ex. 31.  During the September 16, 2005 deposition, Plaintiff's counsel queried Ms. Shontere about the "Memo-File
Coggins."

> Q:  Now, the modified date on Deposition Exhibit No. 23 [Memo-File Coggins],
> under the properties for this file, is Thursday, May 1st, 2003, correct?

> A:  Yes.

> Q:  Okay, and you had actually saved the file called memos-file [sic] Coggins on
> May 1st, 2003, correct?

following:

> I sent the file of Pernevlyn Coggins, applicant for the position of Systems Administrator, MIS, to background this date.  When Ms. Coggins turned in her PHS, she requested that I copy the entire packet.  I explained that I was unable to copy all 42 pages but did accommodate her by copying certain pages, those chosen by her, for her records.  After copying the other documents that were part of the Background packet, Ms. Coggins asked me about the salary for this position.  I invited her to come to my desk and I would look up the pay scale.  I inquired if the salary had been discussed a [sic] the time of the interview and she said that it had not.  When the salary was quoted to her she asked if it was negotiable because of her experience.  I stated that it was not, that this is the starting salary.
>
> Ms. Coggins made several comments about all the information we required and complained that it was more than she was asked to provide for her Secret Clearance.  She questioned whether she had the job and I explained again (the first time being when she was notified after the interview) that she was one of two applicants chosen after the panel interview to go through a background

---

A:  Correct.

Q:  Okay.

A:  As reflected in this, yes.

Q:  Okay, so Deposition Exhibit No. 23 reflects the fact that you had opened and modified the December 30th, 2002 memo regarding Pernevlyn Coggins on May 1st, 2003, right?

A:  Yes, I must have made some change.

Q:  Okay.

A:  I assume that's what the modified means.

Q:  Okay, all right.

A:  In such that I'm a little anal as with the typo I mentioned before, if I had seen a space, I would have corrected it when I saw it.

Q:  Okay.

A:  But I didn't change any of the content.

Docket No. 22, Ex. 9 (Shontere Dep. 86:2 - 22).

investigation and, that after both files were completed, a selection would be made for the position.  She seemed unhappy with that so I asked her specifically if she still wanted to go forward with the process knowing that she may not be chosen.  Ms. Coggins stated that she did so I accepted the paperwork and have forwarded it to [Sergeant] Cleaveland to begin the background investigation.

Please note that Ms. Coggins did not provide her High School Diploma or her college transcripts, as required, but is in the process of obtaining them.

Docket No. 18, Ex. 20; Docket No. 22, Ex. 15.

Ms. Leonhard reported the interactions between Ms. Shontere and Ms. Coggins to her (Ms. Leonhard's) supervisor, Ross Pitrelli, a Caucasian male, the Director of Administrative Services, Charles County Sheriff's Office.  Ms. Leonhard shared Ms. Shontere's memorandum with Mr. Pitrelli.  Ms. Leonhard told Mr. Pitrelli that Ms. Coggins treated Ms. Shontere badly and that Ms. Shontere was upset.  Ms. Leonhard was upset that Ms. Shontere would have to write a memorandum documenting her interactions with Ms. Coggins.  Mr. Pitrelli told Ms. Leonhard to forward Ms. Coggins' file to the Background Investigations Unit.  Docket No. 18, Ex. 10 (Pitrelli Dep. 23:10 - 24:13).

On that same day, Ms. Shontere forwarded Ms. Coggins' file, as well as the file of another applicant for a different position, to Sergeant Cleaveland, a Caucasian male, Lieutenant Operations Commander, Patrol Division, Charles County Sheriff's Office, for background investigations.  A memorandum, prepared by Ms. Shontere, accompanied the files.

Attached please find the *Personal History Statements, Authorizations for Release of Personal Information*, and the current files to begin the background investigation on the following applicants:

**K[] B[] - Part-Time Station Clerk**

**PERNEVLYN COGGINS - Systems Administrator (MIS)**

> Please note: Ms. Coggins states that she is in the process of obtaining a copy of her High School Diploma and has requested her college transcripts be sent to us.

Docket No. 22, Ex. 14

Sergeant Cleaveland assigned Ms. Coggins' file to Robert Denyer, a Caucasian male, who was a background investigator with the Charles County Sheriff's Office.  When Mr. Denyer reviewed the pre-employment file, he saw Ms. Shontere's December 30, 2002 memorandum to file describing her interactions with Ms. Coggins.  Mr. Denyer read the memorandum.  *Id.*, Ex. 4 (Denyer Dep. 36:21 - 37:2).

According to Mr. Denyer, when he initially called Ms. Coggins to schedule an interview, she told him she did not do anything before noon.  Docket No. 18, Ex. 7 (Denyer Dep. 45:11 - 18); Docket No. 22, Ex. 4 (Denyer Dep. 45:11 - 18).  Ms. Coggins denies making such a statement.  *Id.*, Ex. 2 (Coggins Dep. 108:24 - 109:1).  During this initial conversation, Mr. Denyer also recalls Ms. Coggins was combative and uncooperative.  Docket No. 18, Ex. 7 (Denyer Dep. 46:1 - 9).  Further, Ms. Coggins could not provide a date when she would be available for a background investigation interview.  Mr. Denyer "advised [Ms. Coggins] that, you know, she should figure out when it was good for her and let me know." *Id.*, Ex. 7 (Denyer Dep. 49:18 - 19).  Mr. Denyer relayed this conversation to Sergeant Cleaveland who instructed him to call back Ms. Coggins.  Sergeant Cleaveland recalls Mr. Denyer's frustration about trying to schedule an initial interview with Ms. Coggins.  Sergeant Cleaveland recalls being told that Ms. Coggins does not do anything before noon.  Docket No. 18, Ex. 8 (Cleaveland Dep. 35:7 - 14).  Sergeant Cleaveland "encouraged [Mr. Denyer] to set the appointment with the applicant

11

and, and within her, within the time frame that she was offering, and begin the process." *Id.*, Ex. 8 (Cleaveland Dep. 35:14 -16).  Mr. Denyer subsequently scheduled a background investigation interview for January 13, 2003 at twelve o'clock.  Docket No. 22, Ex. 2 (Coggins Dep. 108:9 - 18).

      According to Mr. Denyer, on January 13, 2003, Ms. Coggins arrived at his office hostile. When she saw the stack of paperwork she needed to complete, she requested a written guarantee that she had the job *before* she would complete the paperwork.  Ms. Coggins acknowledges making a comment about the amount of paperwork without a job offer, but claims this statement was made *after* completing the paperwork.

> And I said to him that I thought it was a lot of information to give
> without having a job offer.  And when I made that statement he
> walked out the room and he brought back a probationary offer of
> employment.

Docket No. 18, Ex. 1 (Coggins 112:1 - 4); Docket No. 22, Ex. 2 (Coggins 112:1 - 4).  Despite the dispute about when Ms. Coggins made her statement, it is undisputed that the Sheriff's Office gave her a written Conditional Offer of Probationary Employment.  *See* Docket No. 22, Ex. 29.

      Ms. Coggins filled out the stack of paperwork, then Mr. Denyer brought more paperwork including a Federal Trade Commission ("FTC") document regarding consumer rights.  After an inquiry about the FTC document and an explanation, Ms. Coggins completed this document and the others Mr. Denyer had provided.  Docket No. 22, Ex. 2 (Coggins Dep. 109:24 - 111:15).

      According to Mr. Denyer, after he provided Ms. Coggins with paperwork to complete and when she finished filling out the documents, he reviewed the documents.  There was one document, Authorization for Release of Consumer Report for Purpose of Employment ("Authorization for Release" form), that Ms. Coggins flatly refused to sign.  She told him she

would not sign the document until he provided her a copy of the law that told her she had to sign

the release.

> At that time, I went to my supervisor, who was Sergeant Cleaveland,
> and I explained to h[im] the difficulties we were having, and that I
> was going to send her on her way.  As far as I was concerned, we
> were done.

Docket No. 18, Ex. 7 (Denyer Dep. 38:23 - 39:2); Docket No. 22, Ex. 4 (Denyer Dep. 38:23 -

39:2).

When Mr. Denyer relayed to Sergeant Cleaveland that Ms. Coggins refused to sign the

Authorization for Release form, Sergeant Cleaveland decided to speak with Ms. Coggins and

answer her questions.  According to Sergeant Cleaveland, he spoke with Ms. Coggins for 15 to

20 minutes.  He explained why the Sheriff's Office requested various information and

documents from each applicant to verify the applicant's training, education, employment history,

life experience and financial status.  Even after this detailed explanation, Ms. Coggins still

questioned the need to provide the information.  Sergeant Cleaveland found Ms. Coggins

somewhat aggressive toward him and also found her challenging to the process.  Docket No. 18,

Ex. 8 (Cleaveland Dep. 38:11 - 39:21).

Ms. Coggins denies asking to be shown the law before she would sign the Authorization

of Release form.  *Id.*, Ex. 1 (Coggins Dep. 114:14 - 16); Docket No. 22, Ex. 2 (Coggins Dep.

114:14 - 16).  According to Ms. Coggins, Sergeant Cleaveland told her the Sheriff's Office did

not have a copy of the FTC rights form and further told her she did not have to sign the

Authorization of Release form if she did not want to grant authorization.  Ms. Coggins told

Sergeant Cleaveland she had no problem signing the document.  She felt, based upon reading the

authorization form, she was supposed to receive a FTC document about consumer rights.  Ms.

Coggins signed and dated the authorization form.  Docket No. 18, Ex. 1 (Coggins Dep. 111:6 -

15, 113:17 - 114:13); Docket No. 22, Ex. 2 (Coggins Dep. 111:6 - 15, 113:17 - 114:13).

Sergeant Cleaveland met with his supervisor, Mr. Pitrelli, the Director of Administrative

Services, three or four times a week.  Sometime after his interactions with Ms. Coggins on

January 13, 2003, Sergeant Cleaveland relayed to Mr. Pitrelli Ms. Coggins' initial refusal to sign

the Authorization of Release form.  Sergeant Cleaveland expressed concerns about Ms. Coggins'

demeanor and attitude and described her as very negative, very defensive and overbearing.  Mr.

Pitrelli took no action in response to Sergeant Cleaveland's information.  Mr. Pitrelli was aware

that this was the second time in about a two week period that his subordinates had relayed to him

their interactions with Ms. Coggins.  Mr. Pitrelli told Sergeant Cleaveland to continue with the

background investigation of Ms. Coggins.  Docket No. 18, Ex. 10 (Pitrelli Dep. 24:19 - 25, 26:3

- 25).

Either after his conversation with Ms. Leonhard or after his conversation with Sergeant

Cleaveland, Mr. Pitrelli relayed to Major Michael J. O'Toole, a Caucasian male, Assistant

Sheriff and second-in-command at the Charles County Sheriff's Office, not only information

about Ms. Coggins' attitude and demeanor with personnel in background investigation but also

that Mr. Halvorsen had a conversation with Ms. Coggins encouraging her to apply for the job

which may have given Ms. Coggins the impression that the job was hers if she made it through

the pre-employment process.

> A:   Mr. Pitrelli indicated that there may be a problem [with Mr.
> Halvorsen encouraging Ms. Coggins to apply for the position]
> because the pre-employment matters had not been completed at that
> time and they were having a little bit of difficulty in getting some of
> the information they needed from Mrs. Coggins as well as the attitude
> that she was displaying in her meetings with pre-employment were

less than desirable.

Docket No. 25, Ex. 32 (O'Toole Dep. 15:3 - 9).

Meanwhile, Mr. Denyer began the background investigation.  Mr. Denyer sent an "Employment Questionnaire" to Ms. Coggins' previous employers as well as co-workers and a "Personal Inquiry Questionnaire" to those individuals Ms. Coggins listed as personal references. Mr. Denyer received a completed Employment Questionnaire form from Lisa Ann Wilkins, CFO, of TWM Associates, Inc.  Ms. Wilkins disclosed that Ms. Coggins worked for the company for two weeks.  In response to the question, "Would You Rehire This Person?" Ms. Wilkins checked no, explaining that "[t]he type of work we do here did not seem to be conducive to what Pernevlyn wanted to work on.  The type of work is not a match."  Docket No. 18, Ex. 25 at 2; Docket No. 22, Ex. 26.  Ms. Wilkins rated Ms. Coggins "fair" for the categories of "Reaction to Pressure," "Response to Orders/Instruction," and "Ability to Deal with Others" "[b]ased solely on results of personality conflicts."  *Id.*  Ms. Wilkins had no reservations about Ms. Coggins' suitability for the Systems Administrator position because "the type of work indicated would be much more conducive to Pernevlyn's experience and comfort level."  *Id.* Ms. Wilkins recommended Ms. Coggins for the position.

According to Ms. Coggins, in early February 2003, she called Mr. Denyer and asked if she needed to submit anything else.  He responded no and stated her file was complete.  Mr. Denyer further stated that he was going to forward Ms. Coggins' file to Ms. Shontere.  Docket No. 22, Ex. 2 (Coggins Dep. 129:14 - 130:1).  Mr. Denyer does not recall Ms. Coggins calling him after the background investigation interview of January 13, 2003 inquiring whether she needed to submit anything else.  *Id.*, Ex. 4 (Denyer Dep. 36:2 - 8).

In mid February 2003, Mr. Denyer interviewed by telephone Ms. Coggins' former supervisor, Ms. Wilkins.  During their February 19, 2003 conversation, Ms. Wilkins told Mr. Denyer that Ms. Coggins' work for the company did not involve computer hardware, software, programming or trouble shooting.  "Ms. Wilkins was not aware of any computer skills possessed by the applicant other than those required in normal user operations."  Docket No. 18, Ex. 23 (Bates No. C00236); Docket No. 22, Ex. 22 (Bates No. 000010).  The next day Mr. Denyer interviewed Kevin Gross, Project Manager, Titan Validity Corporation.  Mr. Gross described Ms. Coggins as more qualified than most for the position of Systems Administrator.  Mr. Gross was not aware of Ms. Coggins' computer training.  He did not know if she was trained in UNIX.  Mr. Gross told Mr. Denyer that Ms. Coggins left Titan Validity Corporation because of family reasons and due to issues of not being fairly treated at work.  When Mr. Denyer asked Mr. Gross to elaborate, Mr. Gross declined.  Docket No. 18, Ex. 23 (Bates Nos. C00236 - 00237); Docket No. 22, Ex. 22 (Bates Nos. 000010 - 000011).  Mr. Denyer interpreted Mr. Gross' reluctance to elaborate on the subject as not good.  "Generally, there has been a problem somewhere in the office atmosphere.  And they don't like to elaborate, because they don't want to stick their necks out."  Docket No. 18, Ex. 7 (Denyer Dep. 71:1 - 3).  Mr. Gross told Mr. Denyer he (Mr. Gross) would hire Ms. Coggins again if given the opportunity and recommended her for the position of Systems Administrator.

Also, on February 20, 2003, Mr. Denyer interviewed Deborah Jefferies, Director, North Carolina Central University School of Law Library.  Ms. Jefferies told Mr. Denyer that during Ms. Coggins' last year of employment she maintained the library's computer system.  As reported by Mr. Denyer, Ms. Jefferies stated Ms. Coggins maintained 30 computers.  "Ms.

16

Jefferies is not aware of any computer training the applicant had.  She believes she went to a two

week course designed for network managers."  Docket No. 18, Ex. 23 (Bates No. C00238);

Docket No. 22, Ex. 22 (Bates No. 000012).  Ms. Jefferies recommended Ms. Coggins for the

position.  On February 21, 2003, Mr. Denyer called the College of Southern Maryland to speak

with Charles Patterson.  Mr. Denyer was told Mr. Patterson had retired and no one currently

working at the College of Southern Maryland knows Ms. Coggins.  Docket No. 18, Ex. 23 (Bates

No. C00237); Docket No. 22, Ex. 22 (Bates No. 000012).

Mr. Denyer completed the Applicant Investigation Report before the end of February

2003.[3]  Under the caption "Education," Mr. Denyer noted Ms. Coggins' high school diploma[4]

and college transcripts are included in the file.  Docket No. 18, Ex. 23 (Bates No. C00234);

Docket No. 22, Ex. 22 (Bates No. 000008).  On the last page of the Applicant Investigation

Report, under the caption, "Investigators' Notes," Mr. Denyer wrote the following:

> The applicant was found less than cooperative during her processing.
> She complained about the amount of paperwork she was asked to fill
> out.  She stated [she] should be given the job before being asked to
> do so much paper work.  She at one point refused to sign a consumer
> release[] form without first being provided a copy of the
> law concerning her release of financial information.  After some
> conversation with Sergeant Cleaveland she agreed to sign it.

Docket No. 18, Ex. 23 (Bates No. C00240); Docket No. 22, Ex. 22 (Bates No. 000014).

On the Summary Sheet of the Applicant Background Report, under the category

---

[3] The cover sheet of the Applicant Investigation Report is dated February 10, 2003.  However, some information recorded in the report is dated *after* February 10, 2003, specifically all of the interviews with Ms. Coggins' former supervisors.  On the Summary Sheet of the Applicant Background Report, Mr. Denyer dated this form February 19, 2003 and Sergeant Cleaveland signed the form the same day.  *See* Docket No. 18, Ex. 23 (Bates No. C00233); Docket No. 22, Ex. 22 (Bates No. 000007).

[4] Ms. Coggins admits her high school diploma had not been submitted to the Charles County Sheriff's Office before she received the March 3, 2003 rejection letter.  *See* Docket No. 18. Ex. 1 (Coggins Dep. 120:9 - 19); Docket No. 22, Ex. 2 (Coggins Dep. 120:9 - 19).

"Applicant Processing," Mr. Denyer rated Ms. Coggins' previous employment as "poor."  Mr.

Denyer, as investigator, dated this report, which is part of the Applicant Investigation Report,

February 19, 2003.  On that same day, Mr. Denyer provided the Applicant Investigation Report

to Sergeant Cleaveland.

Upon reviewing the report, Sergeant Cleaveland had questions about Ms. Coggins'

qualifications and her ability to work with fellow employees.  Docket No. 22, Ex. 1 (Cleaveland

Dep. 52:6 - 11).  Before sending her pre-employment file back to Human Resources, Sergeant

Cleaveland noted there was no validation of Ms. Coggins' training and experience such as UNIX

certifications, college transcripts[5], or even the required high school diploma.  *Id.*, Ex. 1

(Cleaveland 54:3 - 16).  Also Sergeant Cleaveland found, not reassuring, the lack of written

responses from former employers.  Sergeant Cleaveland signed and dated the report February 19,

2003.  Sergeant Cleaveland did not check either the "recommended" box or "not recommended"

box.  Docket No. 18, Ex. 23 (Bates No. C00233); Docket No. 22, Ex. 22 (Bates No. 000007).

Sergeant Cleaveland sent Ms. Coggins' file to Human Resources.

According to Ms. Coggins in February 2003, sometime after Mr. Denyer told Ms.

Coggins that he was forwarding her file to Ms. Shontere, Ms. Coggins called Ms. Shontere and

asked if she (Ms. Coggins) needed to submit anything else.  Ms. Shontere responded no, that the

file was complete.  *Id.*, Ex. 2 (Coggins Dep. 130: 2- 9).  Ms. Shontere does not recall receiving a

call from Ms. Coggins.

---

[5] Besides Mr. Denyer documenting in the Applicant Investigation Report that a copy of Ms. Coggins' high school diploma and college transcripts are included in the file, *see* Docket No. 18, Ex. 23; Docket No. 22, Ex. 22, in a January 21, 2003 Memorandum from Julie Shontere to Sergeant Cleaveland, Ms. Shontere wrote, "The attached school transcripts were received in HR today for Systems Administrator applicants PERNEVLYN COGGINS and MAX KUMINOV."  Docket No. 22, Ex. 16.

> Q:   Well, did she ever check in to call on the status of her application, that you recall?
>
> A:   Not that I recall, no sir.
>
> Q:   Did – –
>
> A:   She may have called someone in Human Resources, but I don't recall speaking with her after the time that she had turned [her application] in.

*Id.*, Ex. 9 (Shontere Dep. 24:14 - 20).

Upon receiving and reviewing Ms. Coggins' file from the Background Investigations

Unit, Ms. Leonhard was troubled.

> A:   The concern was, aside from the personality issues, the concern was she didn't have Unix experience and could not provide any certification that she had it. I believe in the background file there was an employer who was asked if she had Unix experience and he said, not to my knowledge or not to my – – if she did, I didn't know about it.  I believe that was how it was worded.
>
> So, that was a huge, huge thing for Eric [Halvorsen] and for MIS at that time.  It was very significant that this applicant or this prospective employee had Unix experience and, aside from the personality issues, that was huge.  And she couldn't – – couldn't provide any certifications.

*Id.*, Ex. 7 (Leonhard Dep. 63:10 - 21).

Ms. Coggins' pre-employment file was submitted to Mr. Pitrelli.  Sergeant Cleaveland

discussed the Background Investigations Unit's findings.

> A:   I, I expressed my concern over not being able to validate some of the training, I expressed my concern over Unix certification documentation, high school transcripts.  That one of the employers, or some of the employers had referenced some difficulties with her interacting with management and other employees, I believe. . . . And in addition to that, some of the employers, when asked about her computer knowledge and training, indicated that it was, they were not

necessarily aware of her training and experience in computers because it was not relevant to her assignment with that agency.  Or it wasn't a job function with that agency.

*Id.*, Ex. 1 (Cleaveland Dep. 55:12 - 17, 19 - 24).  Sergeant Cleaveland recommended to Mr.

Pitrelli that, based on her file, Ms. Coggins should not be hired.  *Id.*, Ex. 1 (Cleaveland Dep.

55:25 - 56:14).

Similarly, Ms. Leonhard had a conversation with her supervisor, Mr. Pitrelli, about Ms.

Coggins.  Ms. Leonhard opined that Mr. Kuminov should be hired instead of Ms. Coggins for

two reasons.  First and the most critical factor was that Mr. Kuminov has Unix experience and

has certifications indicating this experience.  The Sheriff's Office never received such

certifications from Ms. Coggins.  Second, the Sheriff's Office has had some difficulty with Ms.

Coggins because of her demeanor during the background process.  Docket No. 22, Ex. 7

(Leonhard Dep. 5:1 - 20).  Ms. Leonhard elaborated about the second issue.

> A:  I'm sure Mr. Pitrelli and I just discussed [my recommendation] and my concern was, you know, because of the personality issues my concern was that she would have difficulty getting along with people. Any of the civilian jobs, any job at the Sheriff's Office is a customer service job.  You have to deal with employees.  They're very irritated because their computers don't work.  You've got to deal with citizens on occasion and there was a lot of work to do in MIS.
>
> And having someone who can get along with people is huge.

*Id.*, Ex. 7 (Leonhard Dep. 72:10 - 19).

Mr. Pitrelli took Ms. Coggins' and Mr. Kuminov's pre-employment files to Major

O'Toole.  Mr. Pitrelli recommended against hiring Ms. Coggins.

> A:  [T]here's several reasons.  I was very concerned about her being so uncooperative, trying to get a job and being so uncooperative as far as almost combative with Ms. Shontere, the background investigator D[e]nyer and also with Sergeant Cleaveland at the time.

> And also validated by one of her past employers who would not recommend her for employment for the same reasons, that she didn't get along with others and she had a personality conflict from day one and she lasted two weeks in that job. Those things concerned me as far as her coming to work for us. And, not being able to validate whether she met the basic requirements of the job concerned me.

Docket No. 18, Ex. 10 (Pitrelli Dep. 29:14 - 25). Mr. Pitrelli further explained his reasons for recommending against hiring Ms. Coggins.

> A: Based on the uncooperative [sic] with our employees that were working in background and having a negative reference from a recent employer citing the same things that we had picked up in our background investigation through our own employees, not being able to validate UNIX, I thought basically was enough at that point. When I compared it with Mr. Kuminov's background where he had none of those issues. He was valedictorian of his class the year before. He was highly regarded with the Board of Education. It was a very good background. And, when I compared the two of them, side by side I think I felt that Mr. Kuminov was far superior. He had none of the issues that the other applicant had displayed.

*Id.*, Ex. 10 (Pitrelli Dep. 30:6 - 17); Docket No. 22, Ex. 8 (Pitrelli Dep. 30:6 - 17).

Based on Mr. Denyer's recommendation, Sergeant Cleaveland's recommendation and his own assessment, Mr. Pitrelli could not recommend Ms. Coggins and recommended Mr. Kuminov for the Systems Administrator position. Major O'Toole said he would review the files. Docket No. 18, Ex. 10 (Pitrelli 31:8 - 17); Docket No. 22, Ex. 8 (Pitrelli 31:8 - 17).

Major O'Toole invited Mr. Halvorsen to review the backgrounds on Ms. Coggins and Mr. Kuminov. Major O'Toole and Mr. Halvorsen discussed the background investigation reports. Major O'Toole asked Mr. Halvorsen for a recommendation. Docket No. 18, Ex. 2 (Halvorsen Dep. 70:18 - 25); Docket No. 22, Ex. 6 (70:18 - 25). "[B]ased on things that had been reported to me during the background process and based on what I saw in [Ms. Coggins'] results I recommended hiring [Mr. Kuminov]." Docket No. 18, Ex. 2 (Halvorsen Dep. 71:2 - 5);

Docket No. 22, Ex. 6 (Halvorsen Dep. 71: 2 - 5).  Mr. Halvorsen expounded upon his discussion

with Major O'Toole.

> A:  Well, [Major O'Toole] asked me to review both and we talked
> about what we had noticed, both of us, and the concern that we had
> about the fact that we had displayed to us not only a report by the
> background of how difficult the process had been, but, we also had
> evidence in her references that she was difficult to get along with and
> that's not a team player in my book.  And we talked about that part
> of it, the fact that in our situation this is a para-military organization
> and it's vastly different than my job down in D.C.
>
> * * *
>
> It is a different situation and the decision and the discussion that we
> had had to do with the fact that with the pressure that we're under we
> can't afford to have someone on board that's going to cause
> dissension within the team, someone who possibly would object to a
> job given them, or, object to, you know, be out in the field and have
> a problem with something they're do.  So, I mean, if you can image
> the decision the we had to make.
>
> Here we've got somebody that is super qualified for the position, but,
> might be a risk because of attitude[.]

Docket No. 18, Ex. 2 (Halvorsen 97:1 - 9, 16 - 25).

Major O'Toole felt Mr. Kuminov should be hired.  Major O'Toole recommended to

Sheriff Davis that Mr. Kuminov be hired.  After inquiring about the opinions of Mr. Pitrelli and

Mr. Halvorsen, Sheriff Davis gave the green light to hire Mr. Kuminov.  Docket No. 18, Ex. 9

(O'Toole Dep. 19:18 - 25, 25:5 - 18).  Major O'Toole alerted Sheriff Davis of a potential

problem.

> A:  Well, I expressed to him that there may be a potential problem
> here because of initially when Mr. Halvorsen had a conversation with
> Mrs. Coggins there may have been some type of indication on Mr.
> Halvorsen's behalf to lead her to believe that she would be hired and
> I don't – – I don't know the extent of that, but, there may be some
> repercussions in the long run based on the aggravation that we had to

22

> endure in trying to have Mrs. Coggins comply with all of our pre-employment requirements and the attitude that was displayed on her behalf that we all felt – – to include some of the things that were lacking in her background that we were asking for we all felt that it was in our best interest to hire Mr. Kuminov who, by the way, had an excellent background, had excellent work history, and excellent references.

*Id.*, Ex. 9 (O'Toole Dep. 26:2 - 16).  Sheriff Davis confirms he and Major O'Toole discussed the two applicants for the Systems Administrator position.

> A:   As I recall, [Major O'Toole] brought [the files] into my office and told me that there was [sic] two applicants that had come to the top of the list and that they were – – the backgrounds had been done and the recommendation was to hire [Mr. Kuminov] and advised me that Ms. Coggins was an African American female, to make me aware of that, and as I – – he may have talked to me briefly about the two applicants.  I think it was a limited discussion.

> The bottom line was he told me that the recommendation by [Mr. Halvorsen] and – – I'm trying to remember whether it was Ross Pitrelli and [Ms. Leonhard] or not, but the bottom line was that all the recommendations was [sic] to hire [Mr. Kuminov] and [Major O'Toole] was making me aware of the fact that Ms. Coggins was an African American and I said, put that aside for a minute and put the best qualified person, the best person recommended is [Mr. Kuminov], and you do the right thing.

Docket No. 26, Ex. 38 (Davis Dep. 19:22 - 20:11).  Sheriff Davis did not see himself as making the decision to hire Mr. Kuminov but instead asserts Major O'Toole made him aware that the MIS section and Human Resources were choosing Mr. Kuminov.  *Id.*, Ex. 38 (Davis Dep. 19:4 - 17).

According to Ms. Coggins, on February 28, 2003, Ms. Shontere called and informed her that the Charles County Sheriff's Office had selected someone else for the Systems Administrator position who is more qualified.  Docket No. 22, Ex. 2 (Coggins Dep. 130:19 - 23); *see* Docket No. 18, Ex. 1 (Coggins Dep. 120:17 - 24); Docket No. 22, Ex. 2 (Coggins Dep.

120:17 - 24).  Ms. Shontere denies calling Ms. Coggins.

> Q:   Did you call [Ms. Coggins] to tell her about the results of the application process?
>
> A:  No, sir, I didn't.  I contacted her by letter after I was instructed to.
>
> Q:  Okay.  You don't recall calling her to tell her she didn't get the job?
>
> A:  No, sir, I don't recall doing that.

*Id.*, Ex. 9 (Shontere Dep. 24:21 - 25:2).

After the decision was made to hire Mr. Kuminov, Mr. Pitrelli directed Ms. Leonhard to instruct Ms. Shontere to send a letter to Ms. Coggins that a better qualified applicant had been selected and to notify Mr. Kuminov that he had been selected for the Systems Administrator position.  *Id.*, Ex. 7 (Leonhard Dep. 78:13 - 17).  *See id.*, Ex. 9 (Shontere Dep. 78:19 - 79:8).  The March 3, 2003 letter from Ms. Shontere to Ms. Coggins states:

> Thank you for allowing us the opportunity to consider you for employment with the Charles County Sheriff's Office as a Systems Administrator.  The Agency processed numerous applications for this position.  As you know, a background investigation was initiated as part of the hiring process.  This information, your documents, and file have been reviewed.  This letter serves as notification that you are no longer being considered for the position of Systems Administrator.  After careful consideration we have selected an applicant that, we feel, is better qualified for the position.
>
> We sincerely appreciate your interest in becoming associated with the Charles County Sheriff's Office.  We wish you well in locating the opportunity you desire.

*Id.*, Ex. 18.

When Ms. Coggins received this letter, she knew that she was being discriminated against by the Charles County Sheriff's Office.

A:   I knew that I was being discriminated against because I knew that I was the number one choice.  I knew that I was the top selection. I knew that [Mr. Halvorsen] had told his wife that I was everyone's top choice; that he told me personally that everyone was very impressed.  The interview had gone well.  Yeah, I knew at that point. I was – – I knew at that point.

Docket No. 18, Ex. 1 (Coggins Dep. 140:21 - 141:2).

According to Major O'Toole, he spoke to Ms. Coggins after the decision was made to

hire Mr. Kuminov.  Ms. Coggins called the Sheriff's Office asking to speak with the Sheriff.

The Sheriff was not in and it is customary that such calls are referred to Major O'Toole in the

Sheriff's absence.

A:  I recall that she was upset and indicated to me that she could not believe that she was being informed that she was not being selected for the position for which she applied and couldn't understand that after she was led to believe that she would be hired for that job and that's basically the conversation that she had with me.

Q:   Anything further?

A:  I can't recall anything specific further.  I know that she was very frustrated and very upset and I attempted to calm her and told her that I would have Mr. Ross Pitrelli contact her at her convenience and asked for her telephone number which she gave to me.

Q:   Well, did she ask you why she wasn't selected?

A:  She did.  And I didn't answer the question.

Q:   What did you tell her?

A:   I told her I would have the Director of Administrative Services who responds to these matters to contact her.

Docket No. 25, Ex. 32 (O'Toole Dep. 39:8 - 25).

Mr. Pitrelli called Ms. Coggins and informed her that she was not selected for the

position.  Mr. Pitrelli explained that the Sheriff's Office selected someone else who met the basic

requirements of the position.  When Ms. Coggins asked why she was not hired, he responded she did not meet the basic requirements and identified UNIX as one of the requirements.  Docket No. 22, Ex. 8 (Pitrelli Dep. 40:18 - 41:12).

## II.  ADMINISTRATIVE HISTORY

After being notified that she had not selected for the Systems Administrator position, Ms. Coggins wrote a letter to the United States Equal Employment Opportunity Commission ("EEOC"), Baltimore District Office.  In this March 12, 2003 letter, Ms. Coggins wrote in pertinent part:

> Although I believe I have been discriminated against based on my gender I also believe my race is an underlying factor.  The Charles County Sheriff's Office gave the position of Systems Administrator to a male. [sic] Whom I believe is actually less qualified than I am. I do not know his race but I was told that he works locally.  I have no proof that he is white because that is private information and as a private citizen, I have no right to his personal information.  When Ms. Julia Shontere from the human resources department of the CC Sheriff's Office told me that I was not hired because the other applicant, "he had more experience, was more qualified and was a better fit." [sic] At that moment, I knew I was being discriminated against.  I asked her what was it that caused me not to be selected; she said that was all that she was told.  That statement made me question the definition of the words "a better fit."  I knew that the majority of people who work for the Charles County Sheriff's Office are white and/or male.  That it would stand to reason that if I were white and/or male maybe, I would be "a better fit."

Docket No. 18, Ex. 29 (Bates Nos. C00535 - C00536).

On April 15, 2003, Ms. Coggins signed EEOC Form 5, *Charge of Discrimination*, asserting the Charles County Sheriff's Office discriminated against her by not selecting her for the Systems Administrator position on the basis of her race (Black) and sex (female).  Docket No. 22, Ex. 30.  On April 28, 2003, the EEOC sent EEOC Form 131, *Notice of Charge of*

*Discrimination*, to Ms. Shontere, Charles County Sheriff's Office, notifying Ms. Shontere that

Ms. Coggins has filed a charge of discrimination under Title VII of the Civil Rights Act alleging

racial discrimination.[6] *Id.*, Ex. 31.  The Sheriff's Office received this notice on April 30, 2003.

On May 30, 2003, Ms. Coggins wrote a letter to Officer Whitfield of the EEOC, apparently

responding to the Sheriff's Office response to the *Notice of Charge of Discrimination*.  Ms.

Coggins wrote in pertinent part:

> [T]he CC Sheriff's office **did not** ask for a copy of my UNIX training
> certificate.  They asked for a copy of my college transcripts which I
> submitted and received verification from my universities that they
> had done so.  I did not request a copy of my transcripts from
> Oklahoma State University because I did not graduate from there; I
> told them that I had completed 56 hours toward my doctorate.  I only
> included transcripts from the colleges where I actually **earned a
> degree**.  Since the position only called for an Associate degree **or**
> computer school certification, I figured the only education I needed
> to verify was my Bachelor of Science and my Master of Library &
> Information Science.  If they needed a copy of my transcripts to
> prove that I was actually a student there I would have been happy to
> provide them.  Moreover, My UNIX training is not verified through
> transcripts it is verified through a certificate of completion.  Also, the
> CC Sheriff's office did not inform me of the difficulties they had in
> finding out from my former employer (Titan Corporation) if I had
> actually worked with UNIX.  None of these things are hard to comply
> with as you are now verifying had they informed me of any of them.
> It looks very obvious that the CC Sheriff's office is desperately
> reaching for straws; they have no solid evidence or reason for not
> hiring me other than blatant racial and gender discrimination.

Docket No. 18, Ex. 16 (Bates No. C00560), Ex. 26 (Bates No. C00560).

On July 30, 2004, the Acting Director of the Baltimore District Office of the EEOC sent

a Determination Letter to Ms. Coggins, the Charging Party, and the Charles County Sheriff's

---

[6] Ms. Coggins has repeatedly asserted she believes she was discriminated against based on her race *and* her sex.  Apparently, the EEOC failed to mark the "sex" box under the heading, "Circumstances of Alleged Discrimination" on EEOC Form 131.

Office, the Respondent.  The letter states in pertinent part:

>The Respondent denies that Charging Party was discriminated against and contends that Charging Party was not selected for the position of Systems Administrator because of the following: 1) she was unable to produce evidence of her technical experience (UNIX); 2) she never produced the required documentation (high school diploma and college transcripts); 3) she was less than cooperative with the background investigation, and 4) she had some negative commentary from a prior employer(s).  Respondent contends that the White Male[] selected for the position submitted all his documentation, was very cooperative during the background investigation, had excellent job references, had proof of his technical experience (UNIX) and was more qualified than Charging Party.

>Examination of the documentary evidence submitted indicates that Charging Party was never asked to produce training certificates to verify her technical experience, she was only asked to submit a high school diploma and her college transcripts.  Examination of the documentary evidence also shows that as of February 10, 2003, all of Charging Party's documentation (high school diploma and college transcripts) were included and submitted with the applicant's investigation report submitted by the Background Investigator (White Male).  Respondent has failed to submit evidence to prove that Charging Party was less than cooperative with the background investigation.  Although Charging Party did not receive all excellent comments on one of her employment questionnaires where she only worked for two weeks, [this evidence] does not support Respondent's allegation that Charging Party received negative commentary from prior employer(s).  Credible testimony from this employer stated that Charging Party had no personality conflicts with her area manager or any one else, but that Charging Party had a problem personally with the job (Information Security) because it was not what she wanted to do.  Charging Party left on her own because this was not the job that she wanted to do and not because that she was let go for a bad attitude.

>Additional examination of the documentary evidence does not support Respondent's claim that the White Male selected was more qualified than Charging Party.  Documentary evidence shows that the White Male selected has only an AA Degree in Information Technology and one job reference as a Computer Technician.  It was stated by his former employer that he "should have the background for this situation[]" and not that he had the background for this

> position. Further examination of the documentary evidence submitted shows that Charging Party has a BS Degree in Computer Science, an MLS in Library Science and Information, seven years of Systems Administrator's experience and a total of twelve years combined computer experience.
>
> Based on the foregoing evidence obtained in the Commission's investigation, I conclude that there is reasonable cause to believe that Charging Party was not selected for the position of Systems Administrator because of her sex-female and race-Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

Docket No. 22, Ex. 21 (Bates Nos. 000293 - 000294).

In the September 24, 2004 letter, the EEOC notified the Charles County Sheriff's Office and Ms. Coggins that it had referred the case to the United States Department of Justice (the "DoJ") for further consideration. Compl. ¶ 8, Answer ¶ 8. In the November 3, 2004 letter, the DoJ issued a notice of right to file a civil action under Title VII of the Civil Rights Act of 1964, as amended, to Ms. Coggins. The letter explained that Ms. Coggins has 90 days from the receipt of the letter to file a civil action. Docket No. 25, Ex, 31; Compl. ¶9, Answer ¶ 9. Ms. Coggins timely filed her Complaint on January 27, 2005. Docket No. 1.

### III. STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrision v. Nissan Motor*

*Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394

(4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as

to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts

alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.

1985).  The court may not weigh evidence or make credibility determinations.  *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A party who bears the burden of

proof on a particular claim must factually support each element of his or her claim.  "[A]

complete failure of proof concerning an essential element . . . necessarily renders all other facts

immaterial."  *Celotex Corp.*, 477 U.S. at 323.  However, on those issues on which the

nonmoving party will have the burden of proof, it is that party's responsibility to confront the

motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at

256.

In *Celotex Corporation*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear
> the burden of proof at trial on a dispositive issue, a summary
> judgment motion may properly be made in reliance solely on the
> "pleadings, depositions, answers to interrogatories, and admissions
> on file."  Such a motion, whether or not accompanied by affidavits,
> will be "made and supported as provided in this rule," and Rule 56(e)
> therefore requires the nonmoving party to go beyond the pleadings
> and by her own affidavits, or by the "depositions, answers to
> interrogatories, and admissions on file," designate "specific facts
> showing that there is a genuine issue for trial."

30

*Celox Corp.*, 477 U.S. at 324.

However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## IV.  ANALYSIS

In determining whether the moving party has shown there are no genuine issues of material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Tinsely v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998).  Plaintiff disputes all of Defendant's negative characterizations of Plaintiff's demeanor and conduct during her interactions with employees of the Charles County Sheriff's Office.  Docket No. 22, at 29 n.17, 30 n.18.  There are other disputes between the parties as outlined in the Background section *supra*.  Any disputed facts between Ms. Coggins and the employees of the Charles County Sheriff's Office, as summarized earlier in this Opinion, will be viewed in the light most favorable to Ms. Coggins and all inferences will be drawn in Ms. Coggins' favor.

Plaintiff presents no direct evidence of discrimination.  The court therefore turns to the burden-shifting framework outlined in *McDonnell Douglas Corporation. v. Green*, 411 U.S. 792 (1973), to analyze Ms. Coggins' claims.  Plaintiff must establish a prima facie case of

discriminatory failure to hire based on race and sex by showing that (1) she is a member of a protected class; (2) she applied for the Systems Administrator position; (3) she was qualified for the Systems Administrator position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Langerman v. Thompson*, 155 F. Supp. 2d 490, 495 (D. Md. 2001) (citing *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998)) (further citations omitted). If the position was filled, Ms. Coggins may easily prove the fourth prong by showing that someone outside of her protected class ultimately was selected for the position. *Id.* (citing *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 (4th Cir. 2001)).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its employment decision. If the defendant meets its burden of production, the presumption of discrimination drops out. *Reeves*, 530 U.S. at 143. A plaintiff is then allowed to demonstrate by a preponderance of the evidence that the reasons offered by the employer were not the true reasons, but were a pretext for unlawful discrimination.

A.    *Prima Facie Case of Discrimination*

The parties agree that Ms. Coggins meets three of the four factors to establish a prima facie case: (a) Ms. Coggins belongs to a protected class, (b) Ms. Coggins applied for the Systems Administrator position and (c) Ms. Coggins was rejected in favor of a white male candidate, Mr. Kuminov. Docket No. 22, at 16-17. Defendant asserts Ms. Coggins was not qualified for the Systems Administrator position and therefore argues she fails to establish a prima facie case of discrimination. Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), at 19-27. Specifically, Defendant contends Ms. Coggins was not qualified on two grounds: (a) "personality conflict" as

reported by previous employers as well as her abrasive interactions with Sheriff's Office employees demonstrating she lacked the interpersonal skills specified in the job announcement and (b) inability to verify her UNIX training.

Plaintiff argues "Defendant attempts to blend the *prima facie* showing with the question of pretext by claiming that its supposed non-discriminatory reason should also preclude Ms. Coggins' ability to meet her *prima facie* case."  Docket No. 22, at 17-18.  Ms. Coggins asserts, when determining whether a plaintiff has established a prima facie case, the court must examine a plaintiff's evidence separately from a defendant's assertion of legitimate, nondiscriminatory reason for its employment decision.  Otherwise, the allocations of proof the Supreme Court outlined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), would be ignored.  Docket No. 22, at 18.

Regarding her burden to prove she was qualified for the Systems Administrator position, Plaintiff argues, not only did she meet the minimum qualifications outlined in the vacancy announcement, but she exceeded the minimum qualifications.  *Id.*, at 17.  Ms. Coggins not only had a certification of her UNIX training but she taught UNIX at the College of Southern Maryland.  *Id.* at 20-21.  Regarding interpersonal skills, Plaintiff disputes all negative characterizations by Defendant of her interactions with employees of the Sheriff's Office.  *Id.* at 29 n.17, 30 n.18.  As for evaluations from previous employers, Mr. Gross, Ms. Coggins' former supervisor at Titan/Validity Corporation, in an affidavit on Plaintiff's behalf, denies telling Mr. Denyer "that Ms. Coggins felt that she was not being treated fairly at work or that she left for any such reason.  Any suggestion that I made such a statement would be untrue."  Docket No. 22, Ex. B (Gross Aff. ¶ 4).  Additionally, Mr. Gross declared, "[n]either Ms. Coggins nor anyone

else told me that she felt she was being treated unfairly at work at Titan/Validity or that she left Titan/Validity for any such reason." *Id.*, Ex. B (Gross Aff. ¶ 5). Ms. Wilkins of TWM Associates which employed Ms. Coggins in October 2002, in an affidavit on Plaintiff's behalf, denies telling Mr. Denyer that she (Ms. Wilkins) "was not aware of any computer skills possessed by [Ms. Coggins] other than those required in normal user operations." *Id.*, Ex. C (Wilkins Aff. ¶ 3).

In his Reply Defendant asserts Ms. Coggins was not fully candid with the Sheriff's Office and this lack of candor alone disqualified her for employment. The information which Ms. Coggins allegedly did not disclose was her two-week employment with TWM Associates. Ms. Coggins did not list this employment on her resume which she submitted when she applied for the Systems Administrator position. "Had it been listed on her resume and her application, the interviewing panel might have explored this issue and could have concluded at this early stage that she was not qualified for the position." Def.'s Mem., at 22. Defendant nonetheless concedes Ms. Coggins disclosed this information on the Personal History Statement or PHS. Defendant proclaims, "[t]he discovery of this information during the background information disqualified Coggins from employment with the Sheriff's office." Docket No. 25, at 5.

In her Surreply Plaintiff claims "the lack of candor in the application process" is a new argument by Defendant, was not identified among the reasons Defendant listed in his Answer to Interrogatory No. 1 for not selecting Ms. Coggins, and is *post hoc* rationalization and convincing evidence of pretext. Docket No. 26, at 2.

"The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position

for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. This Court will disregard Defendant's recent justification, articulated in his Reply Memorandum, that Ms. Coggins' lack of candor regarding a previous employment *disqualified* her from employment with the Sheriff's Office. First, this reason is not listed as a basis for Defendant's non-selection of Ms. Coggins. *See* Docket No. 22, Ex. 37 (Answer to Interrogatory No. 1). Second, as noted in the EEOC's July 30, 2004 Determination Letter, the Charles County Sheriff's Office identified the following reasons for not selecting Ms. Coggins:

> 1) she was unable to produce evidence of her technical experience (UNIX); 2) she never produced the required documentation (high school diploma and college transcripts); 3) she was less than cooperative with the background investigation, and 4) she had some negative commentary from a prior employer(s).

*Id.*, Ex. 21. Absent from the list is Ms. Coggins' disqualification because of her lack of candor. Third, it is undisputed that the Sheriff's Office notified Ms. Coggins in a March 3, 2003, "[a]fter careful consideration, we have selected an applicant that, we feel, is *better qualified* for the position." *Id.*, Ex. 18 (emphasis added); *see id.*, Ex. 7 (Leonhard Dep. 78:16 - 79:5), Ex. 9 (Shontere Dep. 78:8 - 11). The Charles County Sheriff's Office has a standard rejection letter it sends to unqualified applicants.

> Q:  You have letters indicating that the applicant is not qualified for the position, correct?
>
> A:  Yes, sir.
>
> Q:  And, so, you sometimes send letters to applicants telling them that they're not qualified for the job and, therefore, they're not getting it, right?
>
> A:  In essence.

35

> Q:  Yes?
>
> A:  Yes.

*Id.*, Ex. 7 (Leonhard Dep. 79:9 - 17).  Such a letter was not sent to Ms. Coggins and the court rejects Defendant's belated assertion that Ms. Coggins' lack of candor about a previous employment disqualified her from employment with the Sheriff's Office.

The court now turns to Defendant's original contention that Ms. Coggins fails to prove a prima facie case of discrimination, *i.e.*, that she was ***not qualified*** for the Systems Administration position.  As previously noted, it is undisputed the Sheriff's Office sent Ms. Coggins a rejection letter informing her that a better qualified applicant had been hired.

> Q:  And a better qualified letter is actually a template letter that you
> have for applicants who fall into that category, correct?
>
> A:  Yes, sir, that's correct.
>
> Q:  You have sort of a standard better qualified letter and you adapt
> it to an applicant – –
>
> A:  Yes.
>
> Q:  – – such as Ms. Coggins, correct?
>
> A:  Yes, sir, that's correct.
>
> Q:  Okay.  And that letter says in essence that we thank you for your
> application but we chose an applicant we feel is better qualified for
> the job, right?
>
> A:  Yes, sir, that's correct.

*Id.*, Ex. 7 (Leonhard Dep. 78:18 - 79:5).  The Charles County Sheriff's Office has a standard rejection letter it sends to applicants for non-compliance with application requirements.  Such a form was not sent to Ms. Coggins.

> Q:   You have a turn down letter for non-compliance with the requirements for submitting complete information to the Sheriff's Office, right?
>
> A:  Right.
>
> Q:   Okay.  You didn't send a non-compliance letter to Pernevlyn Coggins, right?
>
> A:  No, sir.

*Id.*, Ex. 9 (Shontere Dep. 78:1 - 7).

Ms. Leonhard corroborates Ms. Shontere's testimony.

> Q:  You also have a non-compliance letter, right?
>
> A:  Correct.
>
> Q:  Okay.  You send a non-compliance letter to an individual who has not provided the information that was requested of the applicant as part of the hiring process, right?
>
> A:  Correct.  Who doesn't respond, yes sir.
>
> Q:   Okay.  And you didn't send a non-compliance letter to Ms. Coggins?
>
> A:  No, ma'am – – no, sir.
>
> Q:   Okay.  You didn't send a not qualified letter to Ms. Coggins, right?
>
> A:  No, sir.
>
> Q:  Is that correct?
>
> A:  That's correct.

*Id.*, Ex. 7 (Leonhard Dep. 79:18 - 80:7).

Defendant's employees confirm the existence of at least three standard rejection letters:

a) not qualified, b) non compliance and c) better qualified applicant.  The Sheriff's Office did not

37

send Ms. Coggins the "not qualified" letter nor the "non compliance" letter.  Rather, in rejecting

Ms. Coggins for the Systems Administrator position, the Sheriff's Office sent Ms. Coggins the

"better qualified applicant" letter.  Based on this evidence, the court rejects Defendant's

assertion that Ms. Coggins was not qualified for the position.  The court therefore finds Ms.

Coggins has demonstrated, by the preponderance of the evidence, a prima facie case of

discrimination.

Since Ms. Coggins has succeeded in proving a prima facie case, the burden now shifts to

the Sheriff "to rebut the presumption of discrimination by producing evidence that the plaintiff

was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason."

*Burdine*, 450 U.S. at 254.

B.      *Legitimate, Non-Discriminatory Reasons*

In the alternative to his argument that Ms. Coggins fails to demonstrate a prima facie

case, the Sheriff claims he rebuts Ms. Coggins' prima facie case with legitimate,

nondiscriminatory reasons based on her inability to get along with others and the Sheriff's

inability to verify her UNIX background.  It is not disputed that one of the general character

requirements of the Systems Administrator position is "interpersonal skills."  Docket No. 18, Ex.

11.  The Job Description identifies the work environment characteristics which include

"[f]unction in a structured organization with strict rules of conduct[,]" "[e]stablish and maintain

effective working relationships with coworkers and supervisors[,]" "[a]ppropriately accept

supervision, criticism, and evaluation[,]" and "[d]eal tactfully, effectively, and equitably with

people, both within and outside the Agency."  *Id.*  Declining to select an applicant who does not

exhibit the interpersonal skills and attributes to work with others required for the position is a

legitimate, nondiscriminatory reason for the Sheriff's employment decision.  Further, one of the essential duties of the Systems Administrator position is "[r]esponsible for the general administration of the computer server hardware systems and their connectivity and availability *with emphasis on the servers that operate under UNIX*."  *Id.* (emphasis added).  The inability to verify an applicant's UNIX background, when a UNIX background is essential to the position, is also a legitimate, nondiscriminatory reason for declining to hire an applicant.  The court finds the Sheriff has carried his burden of production and rebutted the presumption of discrimination by producing evidence that Ms. Coggins was rejected for legitimate, nondiscriminatory reasons.  *Burdine*, 450 U.S. at 254.

C.      *Reasons Offered – Pretext for Discrimination*

Once the defendant satisfies his burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* at 253.  "The plaintiff may meet this burden 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Wileman v. Frank*, 979 F.2d 30, 33 (4th Cir. 1992) (quoting *Burdine*, 450 U.S. at 256)).  "[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves*, 530 U.S. at148.

Before addressing the evidence Plaintiff claims is indicative of discrimination, as

39

previously noted, for the first time, in his Reply, the Sheriff asserts Ms. Coggins was disqualified for employment because she presented incomplete and misleading information about her employment history.  Docket No. 25, at 4 - 6.  The offering of different justifications at different times for his failure to hire Ms. Coggins is, in and of itself, probative of pretext.  *Sears Roebuck*, 243 F.3d at 852-53.  Moreover, it would not be inappropriate for a fact finder to infer from the Sheriff's belatedly asserted justification that it is a post hoc rationale and not a legitimate, nondiscriminatory explanation for the Sheriff's decision not to hire Ms.  Coggins.  *Id.* at 853.

Plaintiff identifies the following as proof that the Sheriff's reasons for rejection her application are pretexts for discrimination: (a) the background investigation report was a sham, (b) Ms. Coggins' superior qualification over the selectee, Mr. Kuminov, (c) changes in the Sheriff's hiring procedures, (d) claims of Ms. Coggins' personality difficulties were manufactured and (e) the Sheriff applied "double standards" to Ms. Coggins when compared to other job candidates.  The court addresses each assertion in turn.

1.      *The Background Investigation Report*

Plaintiff contends the background investigator, Mr. Denyer, intended to sabotage her prospects for employment as evident by the falsities or inaccuracies of the background investigation report.  It is undisputed that Ms. Wilkins, a former employer, informed the Sheriff's Office of a personality conflict Ms. Coggins had with an assigned supervisor which prompted Ms. Coggins' departure from employment after two weeks on the job.  Ms. Wilkins noted this personality conflict in the Employment Questionnaire she completed.  Mr. Denyer also mentioned this personality conflict in the summary of his conversation with Ms. Wilkins.  Although Ms. Wilkins has submitted on Plaintiff's behalf an affidavit disputing that she told Mr.

Denyer that Ms. Coggins had no computer skills other than those required in normal user operations, *see* Docket No. 22, Ex. C, she does not deny informing the Sheriff's Office of Ms. Coggins' personality conflict.  This reported personality conflict, coupled with Ms. Coggins' allegedly abrasive interactions with Sheriff's Office staff, was one of the reasons Ms. Leonhard, Sergeant Cleaveland and Mr. Pitrelli did not recommend Ms. Coggins for the position and this personality trait played a role in Major O'Toole's decision.  "'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)(quoting *Smith v. Fax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).  Ms. Coggins presents no evidence contradicting the Sheriff's reliance on Ms. Wilkins' assertion of a personality conflict.

Plaintiff alleges Mr. Denyer also fabricated the accounts of contacts with former employers.  Mr. Gross and Ms. Jefferies have signed affidavits challenging portions of Mr. Denyer's accounts of contacts.  *See* Docket No. 22, Exs. A, B.  Mr. Gross specifically denies Mr. Denyer's account that he (Mr. Gross) reported Ms. Coggins left her employment in part because she felt she was not being treated fairly.  In his report, Mr. Denyer wrote that he contacted the College of Southern Maryland on February 21, 2003 to speak with Charles C. Patterson but was told Mr. Patterson had retired and none of the current staff knew Ms. Coggins.  Strangely, however, Mr. Patterson completed the Sheriff's Office Employment Questionnaire on *January 30, 2003 before* Mr. Denyer supposedly called.  *See id.*, Ex. 25.  Further, according to Mr. Denyer's report, only Ms. Wilkins responded to a written request for information.  Although Mr. Gross' questionnaire is dated February 24, 2003 *after* his telephone conversation with Mr. Denyer on February 20, 2003, *see id.*, Ex. 23, like Mr. Patterson, Ms. Jefferies completed the

questionnaire on *January 22, 2003 before* her telephone conversation with Mr. Denyer on February 20, 2003.  Both Mr. Patterson and Ms. Jefferies provided extremely favorable evaluations.  Neither report suggests Ms. Coggins having any personality conflicts.

Besides reporting on Ms. Coggins' "personality issues," Mr. Denyer's accounts of contacts with former employers suggest Ms. Coggins has limited computer knowledge or lacked the specific computer knowledge, *i.e.*, UNIX, required for the Systems Administrator position. Ms. Coggins has presented evidence (the affidavits of Ms. Jefferies, Mr. Gross and Ms. Wilkins) contradicting the suggestion that she has no specialized computer knowledge or limited knowledge and experience as a computer specialist.

In his Reply Memorandum, the Sheriff remarks "that in her zeal to paint Denyer as a villain, a liar and a fabricator, Coggins has omitted any reference to all of the positive things Denyer noted in his report.  Docket No. 25, at 14 n.6.  The Sheriff responds that the claimed fabrication by Mr. Denyer is irrelevant and, even if proven, cannot be held against the Sheriff under Title VII for the unauthorized acts of an employee who is not a decision maker.  *Id.*, at 14-16.  It is undisputed that Major O'Toole and/or the Sheriff were the actual decision makers.  It is also undisputed that the findings reported by Mr. Denyer, which were reviewed and relied upon in part by Sergeant Cleaveland and Mr. Pitrelli for their non-recommendations of Ms. Coggins and also relied upon at least in part by Major O'Toole and/or the Sheriff, had a substantial influence upon the decision not to hire Ms. Coggins.  It is further uncontested that Mr. Denyer was not a decision maker in the non-selection of Ms. Coggins for the Systems Administrator position.  *See* Docket No. 26, Ex. 39 (Answer to Interrogatory No. 2).

In *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 291 (4th Cir.

42

2004), the Fourth Circuit imposed upon a plaintiff claiming discrimination under Title VII based upon discriminatory motivations of a subordinate employee the burden of presenting sufficient evidence that the subordinate employee had such authority as to be viewed as the one principally responsible for the employment decision.  The Fourth Circuit specifically rejected a substantial influence test to impose employer liability under Title VII for a subordinate employee's discriminatory animus.

> [W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

*Id.* Viewing the evidence in the light most favorable to Plaintiff, even if the court accepts Plaintiff's assertion that Mr. Denyer fabricated comments from her former employers to sabotage her prospects for employment, since Mr. Denyer was not the decision maker, these acts by Mr. Denyer do not establish that the Sheriff's reasons for not selecting Ms. Coggins were pretextual because Mr. Denyer's acts do not create or impose liability on the Sheriff.

2.      *Ms. Coggins' Superior Qualifications*

Plaintiff claims, in every measure, she was more qualified for the position than Mr. Kuminov.  *See* Docket No. 22, at 24-25.  The striking disparity in qualifications coupled with the selection of Mr. Kuminov could leave a jury to find as pretextual the Sheriff's nondiscriminatory reasons.

In response the Sheriff concedes the decision not to hire Ms. Coggins was based on

incomplete or imperfect data.[7]  Ms. Coggins' college transcripts do not reflect UNIX training.

Her former employer, Mr. Gross, could not verify UNIX training.  Whether the Sheriff had

incomplete or inaccurate information is not relevant.  "There is no evidence in this record

indicating that Pitrelli or O'Toole had any reason to doubt [the validity of Mr. Denyer's

information].  Pitrelli testified that it was his impression that Coggins' UNIX background had

not been verified and that this was a factor in his recommendation.  O'Toole testified that he

relied on the reports of incomplete information in Coggins' background."  Docket No. 25, at 12

(internal citation omitted).  Defendant argues, where an applicant provides incomplete

information, the employer's rejection of the applicant is a legitimate, nondiscriminatory ground

for finding the applicant not qualified within the meaning of Title VII.  *See Hill v. Metropolitan

Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1541 n.9 (11th Cir. 1988).

Ms. Coggins claims she would have provided proof of her UNIX training and experience

if asked.  First, it is not disputed that the Personal History Statement or PHS did not instruct Ms.

Coggins to submit certification of UNIX background.  Docket No. 18, Ex. 15 (Bates No.

C00106).  *See* Docket No. 22, Ex. 7 (Leonhard Dep. 65:25 - 66:4 ) ("Q:   And I gather there's

nothing in the instructions for the personal history statement that suggests that an individual

should provide their professional certifications, right?   A:   That's correct."), Ex. 9 (Shontere

Dep. 73:17 - 21) ("Q:   In fact, your office does not require individuals, as part of the instructions

for the Personal History Statement, to submit copies of any professional certifications, correct?

A:   Correct.").  Second, employees in Human Resources and the Background Investigations

Unit believe the other section was responsible for requesting professional certifications from an

---

[7] The Sheriff concedes, during this litigation, Ms. Coggins "has more fully documented her UNIX training and experience."  Docket No. 25, at 12 n.3.

applicant.  *Compare* Docket No. 22, Ex. 4 (Denyer Dep. 24:24 - 25:2, 25:16 - 22) ("Q:   So, it's your impression that personnel asks individuals to provide professional certifications in the field of study that their job is involved in?  A:   Yes, sir. . . . Q:   [Y]ou're not aware of asking her to provide any professional certifications aside from formal education?  A:   No, sir.  Q:   Okay. You didn't ask her to provide any Unix certificate in this case, did you?  A:   No, sir.") *with* Ex. 7 (Leonhard Dep. 66:4 - 8, 16 - 21) (emphasis added) ("A:   I believe the investigators, the investigator, Mr. Denyer, asked her to provide certifications for her Unix.  Q:   That's your understanding?  A:   Yes, sir, it is. . . . Q: Now, are you saying that Robert Denyer told you that he had asked Pernevlyn Coggins for her Unix certification?  A:   I don't know [if] Mr. Denyer did specifically or Lt. Cleaveland, but, *it was my understanding that she had been asked to produce those certifications and had not.*") *and* Ex. 9 (Shontere Dep. 73:17 - 23) ("Q:   [Y]our office does not require individuals, as a part of the instructions for the Personal History Statement, to submit copies of any professional certifications, correct?  A:   Correct.  Q: Thank you.  A:   That would come from the investigator.").   Moreover, Mr. Halvorsen, as a member of the panel which recommended Ms. Coggins for the position, expected Human Resources to request certifications from Ms. Coggins.  *Id.*, Ex. 6 (Halvorsen Dep. 75:6 - 14) ("Q:  Okay.  Did you ever ask Pernevlyn Coggins to submit any certifications in connection with her application for the systems administrator job?  A:   No.  It's not something that I would do. Okay.  A:   It would be part of the background process.  Q:   Okay.  I gather you [are referring to] human resources personnel.  Is that the – – A:   Yes.").   Third, Mr. Kuminov, the individual the Sheriff's Office selected, did not submit copies of his professional certifications to either Human Resources or the Background Investigations Unit.  *See id.*, Ex. No. 4 (Denyer Dep. 25:7 - 11),

45

Ex. No. 7 (Leonhard Dep. 69:10 - 22, 70:17 - 71:18).  Ms. Leonard believed Mr. Kuminov's

college transcript, identifying UNIX courses, constituted certification.  *Id.*, Ex. 7 (Leonhard Dep.

67:9 - 15, 20 - 24, 69:4 - 22).  Fourth, although Mr. Denyer inquired about Ms. Coggins' Unix

training from at least one of her former employers, *id.*, Docket No. 4 (Denyer Dep. 57:11 - 58:2),

Mr. Denyer never inquired about Mr. Kuminov's Unix training when speaking with Kuminov's

former employers, *id.*, Docket No. 4 (Denyer Dep. 27:12 - 24).  Fifth, viewing the facts in the

light most favorable to Plaintiff, the nonmoving party, Ms. Coggins, on separate occasions,

called Mr. Denyer and Ms. Shontere and asked if she needed to submit anything else.  Both Mr.

Denyer and Ms. Shontere individually responded that Ms. Coggins' file was complete.  *Id.*, Ex. 2

(Coggins Dep. 129:14 - 130:9).  Based on the evidence, the inability of the Sheriff's Office to

verify Ms. Coggins' UNIX background appears attributable to the Sheriff's Office and *not* Ms.

Coggins.  "The fact that a court may think the employer misjudged the qualifications of the

applicant[] does not in itself expose him to Title VII liability, *although this may be probative of*

*whether the employer's reasons are pretexts for discrimination*."  *Burdine*, 450 U.S. at 259

(emphasis added).  The court finds there are genuine issues of material fact and summary

judgment is inappropriate.

> 3.    *Changes in the Sheriff's Hiring Procedures*

Plaintiff argues that a jury could infer a discriminatory motive due to the Sheriff's sudden

change in hiring procedures.  Docket No. 22, at 26.  It is undisputed that the interviewing panel

ranked Ms. Coggins as the number one candidate.  *Id.*, Ex. 6 (Halvorsen Dep. 70:3 - 4) ("A:   As

far as we were concerned we selected the person that we wanted and that was that.").  According

to Mr. Halvorsen, when he submitted Ms. Coggins' name, Ms. Leonhard recommended two

candidates be sent to background for the position.  *Id.*, Ex. 6 (Halvorsen Dep. 60:3 - 5, 61:4 - 13, 65:18 - 24).  Ms. Leonhard acknowledged that she recommended to Mr. Halvorsen that two candidates be sent to background.  *Id.*, Ex. 7 (Leonhard Dep. 34:19 - 21).  According to Ms. Leonhard, it was not unusual to send two candidates to background for a technical position.  *Id.*, Ex. 7 (Leonhard Dep. 34:10 - 14).  However, Mr. Halvorsen found it unusual when Ms. Leonhard made the recommendation.  He had never previously been asked to send two candidates for a job to background.  *Id.*, Ex. 6 (Halvorsen Dep. 61:14 - 18).

Defendant claims no disparate treatment occur.  First, the Sheriff's Office has no policy regarding how many candidates are sent for a background investigation; this matter is left to the discretion of the Human Resources Department.  Second, "the mere fact that two persons were submitted to background simultaneously, to avoid a gap in the event the first person did not receive approval, does not show disparate treatment."  Docket No. 25, at 13.  Third, the Sheriff notes Ms. Coggins and Mr. Kuminov, the selectee, both had to endure the same background investigation.

Mr. Halvorsen understood why Ms. Leonhard recommended two individuals be sent for background — the Sheriff's Office had previously been "burnt" when one candidate was sent to background for the operations specialist position.  That candidate was not fully cooperative with background, and ultimately did not make it through background.  Mr. Halvorsen's section had waited during three months of a background investigation and now the Sheriff's Office had to start the process over again.  Docket No. 22, Ex. 6 (Halvorsen Dep. 62:20 - 63:20).  This unsuccessful candidate was Scott Mueller.  Plaintiff notes that "Mueller was rejected well after, not before, the December 20, 2002 decision to add Kuminov to the hiring pool."  *Id.*, at 27.  It is

undisputed that in a February 10, 2003 memorandum, a background investigator discovered Mr.

Muller had supplied false information to the Sheriff's Office.  *Id.*, Ex. 36.  Despite this

experience, when the Sheriff's Office re-advertised for the position, a panel selected the top

candidate (Michael Clark, a Caucasian male) and submitted his name to Human Resources.  Mr.

Halvorsen was not asked to send two candidates for background.  *Id.*, Ex. 6 (Halvorsen Dep.

63:21 - 64:11).

Viewing the evidence in the light most favorable to Plaintiff, even if Ms. Leonhard's

recommendation that two candidates be sent to background was an aberration, Ms. Coggins fails

to present any evidence that Ms. Leonhard's recommendation was motivated by a discriminatory

animus.  For example, no evidence has been presented that Ms. Leonhard knew, based on Ms.

Coggins' name only, that she was African American and a female.  Pernevlyn is an unusual

name and does not, on its face, indicate the individual's race or sex.  Plaintiff has failed to

demonstrate pretext.

    *4.     Ms. Coggins' Personality*

The Sheriff also asserts that Ms. Coggins' abrasive personality is a legitimate,

nondiscriminatory reason for her non-selection.  The Sheriff notes that the job description made

plain that Ms. Coggins had to exhibit appropriate interpersonal skills.  *See* Docket No. 18, Ex.

11.  "[T]he undisputed evidence establishes that the background investigation drew into question

Coggins' ability to meet these standards."  Def.'s Mem., at 22.  This "undisputed evidence"

consist of Ms. Wilkins' response to an employment questionnaire that Ms. Coggins left after two

weeks due to a personality conflict with an assigned project manager.  Docket No. 18, Ex. 25;

Docket No. 22, Ex. 26.  According to Mr. Denyer, Ms. Wilkins told him Ms. Coggins was

"strong willed."  The Sheriff also relies on Mr. Denyer's account of his conversation with Mr.

Gross, another former employer, who purportedly stated Ms. Coggins left in part because she felt

she was not being treated fairly.

　　　In her Opposition, Plaintiff submits affidavits from Ms. Wilkins and Mr. Gross.  As the

Sheriff notes, Ms. Wilkins has not retreated from her statement that Ms. Coggins left due to a

personality conflict.  Docket No. 25, at 5.  Ms. Coggins maintains she departed primarily

because of the commute but acknowledges that her supervisor was not receptive to her ideas and

that played a part in her decision to depart.  *See* Docket No. 18, Ex. 1 (Coggins Dep. 66:7 -

73:24).  Viewing the evidence in light most favorable to Plaintiff, the court finds Ms. Coggins

departed from this employment, in part, because of differences with an assigned supervisor,

someone other than Ms. Wilkins.  Regardless of this conflict, it is undisputed that Ms. Wilkins

recommended Ms. Coggins for the Systems Administrator position.  With regard to Mr. Gross,

he denies Mr. Denyer's account claiming Mr. Gross stated Ms. Coggins departed, after 3 ½

years, in part because she felt she was being treated unfairly.  *See* Docket No. 22, Ex. B (Gross

Aff. ¶ 5).  There is a dispute about what Mr. Gross stated to Mr. Denyer.  Viewing the evidence

in the light most favorable to Plaintiff, the court finds Mr. Gross did not make such a statement.

　　　As another example of Ms. Coggins' allegedly abrasive personality, Mr. Denyer testified

that Ms. Coggins demanded a written job offer *before* she would complete the paperwork.  Ms.

Coggins claims she asked for a written job offer *after* she completed the paperwork.  Although

there is a dispute about when Ms. Coggins made her request, it is undisputed that Mr. Denyer

had also provided Mr. Kuminov a conditional offer during his background investigation

interview on January 13, 2003.  *See id.*, Ex. 4 (Denyer Dep. 33:14 - 23).  Additionally, Mr.

Denyer concedes, as a standard practice, prospective employees are given a conditional offer of employment "to let the applicant know that assuming the background interview goes well, and that the employers are satisfied with them, that they will have the job[.]"  *Id.*, Ex. 4 (Denyer Dep. 34:3 - 6).

Ms. Coggins contends she was courteous with the Sheriff's staff.  "Defendant's argument is dependent on accounts of two white employees that are disputed and dependent on credibility determinations, and thus are incapable of resolution at this stage."  Docket No. 22, at 15 (citing *Anderson*, 477 U.S. at 255).  The court agrees.  Moreover, not only did Ms. Coggins' former employers and personal references provide very good to excellent recommendations, the interviewing panel from the Sheriff's Office, which ranked Ms. Coggins the number one candidate for the Systems Administrator position, was extremely impressed with Ms. Coggins. Each praised Ms. Coggins on her personality.  *See* Docket No. 22, Ex. 3 (Crehan Dep. 26:6 - 10) ("A:  Just her demeanor.  How when we would ask her questions she would – if I asked her a question she would look me in the eyes and give me an answer.  She seemed happy; I mean, happy to be there.  The overall experience, as I recall, was a pleasant one.  We liked her."); Ex. 5 (Keys Dep. 13:12 - 13) ("A:   Her personality was very warm, very positive person."), Ex. 6 ( Halvorsen Dep. 58:22 - 24) ("A:   And we really felt that Pernevlyn [Coggins] would be a good fit as a teammate, as a team member.").  The stark contrast between the three panelists' interactions with Ms. Coggins versus Ms. Shontere's and Mr. Denyer's interactions with Ms. Coggins, coupled with Ms. Coggins contesting their (Denyer's and Shontere's) versions of events, raises genuine issues of material fact, specifically because the Sheriff identified Ms. Coggins' abrasive personality as a legitimate, nondiscriminatory reason for non-selection, and

50

thus summary judgment is not appropriate.  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Reeves*, 530 U.S. at 150 (quoting *Anderson*, 477 U.S. at 255).

     5.      *"Double Standard" Applied to Ms. Coggins versus other Applicants*

Finally, Ms. Coggins cites, as proof of pretext, the application of a "double standard" to her that was not applied to Caucasian and male applicants.  Ms. Coggins identifies the following as evidence of a double standard: (a) UNIX Certificate, (b) transcripts from Oklahoma State University, (c) high school diploma, (d) aggressiveness and (e) personality conflicts.  The court declines to address the topics of the UNIX Certificate and aggressiveness[8] since these topics have been discussed.  *See supra.*

Ms. Coggins cites to evidence of other applicants, persons outside her protected class (race and sex) who were hired by the Sheriff's Office despite (a) not submitting transcripts from universities where the applicant did not obtain a degree or (b) not submitting a high school diploma.  Ms. Shontere's own pre-employment file shows she submitted a high school transcript instead of a high school diploma and did not submit a transcript from Charles County Community College where she did not obtain a degree.  Document No. 22, Ex. 9 (Shontere Dep. 13:7 - 21).  Ms. Shontere admitted that, despite the PHS' instruction that an applicant must submit a copy of his/her high school diploma, by policy, the Sheriff's Office accepts a high school transcript *in lieu of* a high school diploma.  *See id.*, Ex. 9 (Shontere Dep. 50:2 - 7, 51:5 - 10).

The Sheriff claims, contrary to his office's requirements, Ms. Coggins did not submit a

_____

[8] "Defendant claims to have rejected Ms. Coggins' application because of a disputed and contrived claim that she was 'aggressive[.]'"  Docket No. 22, at 37.

transcript from one of the universities she attended and did not submit her high school diploma. Docket No. 25, at 2.  Although in Ms. Coggins' case the Sheriff demands applicants follow instructions precisely, in Ms. Shontere's case as well as with other applicants hired by the Sheriff, the standard apparently was relaxed.  *See* Docket No. 22, Ex. 1 (Cleaveland Dep. 70:14 - 78:12).  Nonetheless, the court finds the alleged double standard is irrelevant because Ms. Coggins was not disqualified from employment on this ground (despite the Sheriff's recent assertion *supra*) and thus this is not probative of pretext for discrimination.  Moreover, Ms. Coggins has not presented adequate evidence showing that Ms. Shontere and the other applicants, not of Ms. Coggins' protected class, were similarly situated in all relevant respects. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  Plaintiff has not demonstrated pretext.

Finally, Ms. Coggins notes other applicants, not of her protected class, had documented histories of personality conflict.  The Sheriff's Office did not develop further information regarding those conflicts and these applicants, Caucasian females and a Caucasian male, were subsequently hired.  Docket No. 22, at 37-38.  As Sergeant Cleaveland testified, having a personality conflict at a previous job does not automatically disqualify an applicant but he would want that matter explored.  *Id.*, Ex. 1 (Cleaveland Dep. 67:4 - 13).  The Sheriff does not address this topic in his Reply Memorandum.

Based on the record, the court cannot glean why, with regard to other applicants not of Ms. Coggins' protected class, the Sheriff's Office declined to explore further those applicants' histories of personality conflict.  The court has no information regarding the importance of interpersonal skills for these other positions but presumes this is a critical trait because,

according to Ms. Leonhard, "any job at the Sheriff's Office is a customer service job." *Id.*, Ex. 7

(Leonhard Dep. 72:13 - 14).  The court does not know if the policy of the Sheriff's Office has

changed or whether background investigators have discretion whether to explore further

personality conflicts at previous jobs.  As for the two Caucasian female applicants, the court

finds Ms. Coggins is not similarly situated to them in all relevant aspects because these

applicants *disclosed* the personality conflicts at previous jobs on the PHS.  *See id.*, Ex. 1

(Cleveland Dep. 71:5 - 9, 76:22 - 77:4).  The Caucasian male similarly *disclosed* to the

background investigator his propensity to get into trouble.  *See id.*, Ex. 8 (Pitrelli Dep. 60:11 -

14).  Plaintiff has not demonstrated pretext.

## **V.**   **CONCLUSION**

For the foregoing reasons, the court finds there are genuine issues as to material fact and

thus Defendant is not entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An Order

will be entered separately denying Defendant's Motion for Summary Judgment.

May 31, 2006                                                   /s/
_____                    _____
        Date                                              WILLIAM CONNELLY
                                                 UNITED STATES MAGISTRATE JUDGE